[Civ. No. 16425. Second Dist., Div. One. Jan. 6, 1949.]

MARC SILVER, Plaintiff, v. JOSEPH SHEMANSKI, as Executor, etc., Defendants. HELEN SILVER, Appellant, v. MARC SILVER as Trustee, etc., et al., Respondents.

Kenneth J. Murphy and Joseph W. Ryan for Appellant.

Benjamin & Lieberman, Benjamin & Kronick, in pro. per., Bodkin, Breslin & Luddy, S. V. O. Prichard and Wiseman & Elmore for Respondents.

WHITE, J.—This litigation was instituted by Marc Silver through the filing by him on October 29, 1945, of a complaint for declaratory relief, naming as defendants, Joseph Shemanski, as executor of the last will and testament of Isidor Silver, deceased, and Helen Silver, widow of said decedent. In such complaint for declaratory relief, the terms and provisions of the last will and testament of Isidor Silver were alleged, with the claim that by clause 5 of the will it was expressly and impliedly agreed and understood by and between the decedent, Isidor Silver and his wife, defendant Helen Silver, and was so intended by them, that all property held in their record names as joint tenants continued to be and was their community property, and was disposed of by the will. The existence and legal effect of a "waiver" signed by the wife Helen Silver was pleaded, and the complaint alleged that by and through the aforesaid "waiver" Helen Silver accepted and acquiesced in the provisions of the will disposing of all the property. The complaint further alleged the existence of a controversy between the parties (Code Civ. Proc., § 1060), and the respective contentions of plaintiff and defendants in said action were set forth. By the prayer of the complaint

the court was asked to adjudicate that all of the joint tenancy property and the proceeds of any sales of said property that ⌐ad been made were in fact community property, and constituted a part of the community property of the estate of Isidor Silver which was disposed of by his will.

The complaint in the declaratory relief action was not immediately or ever served upon either defendant. At the time of filing said complaint it appears that both defendants were temporarily absent from the State of California.

In the interest of clarity we here set forth the pertinent parts of the factual background surrounding this litigation. The decedent Isidor Silver and his wife Helen Silver, one of the defendants in the declaratory relief action, were married in Seattle, Washington, on August 14, 1924, and very shortly thereafter came to Los Angeles. At that time they did not have any property whatsoever except a small amount of cash approximating $1,000. After having engaged in several enterprises, Isidor Silver, on or about the year 1936 or 1937, commenced to buy and sell real estate. On June 21, 1937, he executed a will which (with the waiver attached) has been admitted to probate. By the terms of the waiver Helen Silver allegedly certified that she understood that the will of her husband, to which this document was attached, proceeded to dispose not only of his separate property, but also of the community property of the spouses, including her half, and that by the waiver she was electing to take under the will and acquiesced in its provisions.

Thereafter, and before his death, Isidor Silver executed three codicils. At the time of his death, the spouses had amassed a sizable holding of real property. This property was held in two distinct categories. Title to some of it stood in the name of Isidor Silver and this was promptly taken into his estate and was later appraised at $262,703.80. Fifteen parcels stood in joint tenancy between the decedent and defendant Helen Silver. These were later appraised at $504,600. All of this property was heavily encumbered.

Decedent Isidor Silver died March 28, 1945. Following his death, the two categories of property above described were handled quite differently. There is evidence in the record that shortly after the demise of her husband, his widow Helen Silver and her brother Ben Bridge, upon whose judgment she strongly relied and in whom she reposed great confidence, requested there should be a delay in determining the status of the properties held of record in joint tenancy until

such time as defendant Helen Silver could discover whether there was some way in which she might avoid the effect of the waiver attached to the will and the trust created in the will, and procure for herself the payment of a sum in cash, and until such time as she and the other heirs might settle the matter amicably. On or about April 3, 1945, defendant Helen Silver named her codefendant Joseph Shemanski (the executor of the estate of her husband) her agent and attorney-in-fact with respect to all of the joint tenancy properties. Thereafter, Joseph Shemanski, acting pursuant to his power of attorney and as the agent of Helen Silver, assumed the management and control of all the joint tenancy properties and, through the medium of deeds executed by Helen Silver, sold 10 of the 15 joint tenancy properties and placed the proceeds of those sales which were not expended for current expenses of maintaining and operating the properties, in a bank account in the name of Helen Silver. In order to sell the 10 parcels of real estate such steps were taken as were necessary to terminate the record joint tenancy between decedent Isidor Silver and his wife Helen Silver, and to make it possible for her to convey the titles to the purchasers of the 10 properties.

In January of 1946, both of the foregoing defendants named in the declaratory relief action returned to California and negotiations were commenced with a view to amicably adjusting and settling the controversy which was the subject matter of such action. At a conference held on January 18, 1946, no conclusion was reached. On February 7, 1946, Joseph Shemanski, executor of the estate of Isidor Silver and attorney-in-fact for the widow Helen Silver, wrote a letter to the aforesaid Ben Bridge, brother and advisor of Helen Silver, informing him that said executor would wait until February 28, 1946, before he took action to present the entire estate matter to the court, and before he would "throw the whole thing in the estate," and "give it to court."

Ben Bridge came to Los Angeles in the latter part of February and a series of conferences ensued in which a compromise agreement was arrived at. The record reflects evidence that during these negotiations a full and open discussion was had, the widow, Helen Silver, was urged to obtain the services of independent counsel, which she refused to do. Throughout the negotiations, however, the widow, Helen Silver, was advised by her aforesaid brother, Ben Bridge.

The compromise agreement bearing date of February 28, 1946, was executed between Helen Silver, the widow, as first party, and Marc Silver, plaintiff in the declaratory relief action and Jetka Zawadzki, Rachela Buistyn and Sala Dach, "whose last place of residence was Poland," as second parties.

After reciting that the first party is the widow of decedent Isidor Silver, and that the second parties are his brother and sisters, that "the present whereabouts of said sisters is unknown to the parties and said sisters have not been heard from for approximately seven years, it is understood that Marc Silver makes and executes this agreement on their behalf," the recitals in the document set forth the contentions of the parties, and particularly the contention of Marc Silver that all of the joint tenancy property was community property and was disposed of by the will of Isidor Silver, should be compromised within his estate and distributed in accordance with the terms of the will. There is a further recital that "the said Marc Silver shall be trustee for his sisters Rachela Buistyn, Jetka Zawadzki and Sala Dach, or if any of them be deceased, for the child or children of such deceased sister, for any interest they may have in the joint tenancy property." The instrument further recites the fact that the present action for declaratory relief had been filed, and that "whereas, the parties are desirous of avoiding any litigation in connection with the aforesaid estate or property and wish to amicably settle all disputes or disagreements which may exist between them regarding the same:

"Now, THEREFORE, in consideration of the abandonment and dismissal of said superior court action, and for other good and valid consideration, the parties hereto hereby mutually agree as follows:."

On February 28, 1946, the date upon which the foregoing compromise agreement was executed, defendant herein, Helen Silver, received $50,000 in cash, and later was paid an additional $26,000 in further part payment under the terms of the agreement. The additional required payments were tendered to Helen Silver within the time prescribed by the agreement, but following the filing of her cross-complaint herein she refused to accept them.

On November 13, 1946, some nine months after the foregoing compromise agreement had been entered into, Helen Silver filed an answer and cross-complaint in the above mentioned declaratory relief action, which it should be remembered is the action that, pursuant to the compromise agreement

to which Helen Silver was a party, was to be abandoned and dismissed. The cross-complaint contained eight counts. By the first two counts cross-complainant Helen Silver sought to vacate and set aside the compromise agreement, in count one, upon the ground that it was procured by fraud, and in count two, upon the ground that it was lacking in adequate consideration. In the remaining counts of the cross-complaint she sought to litigate the following matters: In count three she sought to have the waiver hereinbefore referred to set aside upon the ground that she had signed it in ignorance and without full knowledge of its legal significance. In the fourth count she sought to set aside the same waiver on the ground that it was not supported by a consideration. In the fifth count she sought to set aside the waiver upon the ground that it had been nullified and made inoperative by the later execution of codicils to the will of Isidor Silver. In the sixth count she sought to have it adjudicated that the joint tenancy properties were neither legally nor in fact community property. In the seventh count she sought an accounting of the proceeds of the joint tenancy property from the date of the death of Isidor Silver to the time of the compromise agreement, and in the eighth count she sought an accounting of the rents, issues and profits of the joint tenancy property after the date of the compromise agreement and after she had turned over to Marc Silver the residuum of that property in accordance with the compromise agreement.

When the case was called for trial, plaintiff and cross-defendant Marc Silver and the other named cross-defendants took the position and moved the court that it should first proceed to try the first two counts of the cross-complaint. This motion was grounded on the contention that if the foregoing compromise agreement was found to be a valid agreement then, under the terms thereof, all matters in dispute were set at rest and left nothing further to litigate. This motion was granted and at the conclusion of the trial upon the above-mentioned counts of the cross-complaint, the court held that the compromise agreement was valid and that such determination obviated the necessity of trying the remaining issues, including those framed by the remaining counts of the cross-complaint, as well as those tendered by the original complaint in the declaratory relief action, and all answers filed thereto.

By the judgment,

''It is ordered, adjudged and decreed that the cross-complainant, Helen Silver, should take nothing by her cross-

complaint as against the cross-defendants, or either or any of them. Further ordered, adjudged and decreed that the cross-complaint of Helen Silver be dismissed as against the cross-defendant Jacob J. Lieberman, and as against each and all of the fictitiously named defendants. It is further ordered, adjudged and decreed that the above entitled action should be and the same is hereby dismissed.''

From such judgment defendant and cross-complainant Helen Silver prosecutes this appeal.

For a first ground of appeal it is urged that the trial court erred in first trying the issues framed by counts one and two of the cross-complaint, and in then concluding that the determination arrived at regarding these two counts rendered any further trial unnecessary.

■ While it is ordinarily true that the party who commences an action must exhaust his evidence before the other party is required to begin the presentation of his evidence, in California it is thoroughly established as a principle of law that the order of proof must be regulated by the sound discretion of the court. (Code Civ. Proc., § 2042.) While conceding the existence of this rule, appellant points out that the discretion intended is not a capricious or arbitrary one, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. There can be no doubt but what the discretion contemplated by law is not a mere mental discretion, but a legal discretion, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice. As to when in a legal sense discretion has been abused it has been said that abuse of discretion occurs when in its exercise a court exceeds the bounds of reason, all of the circumstances before it being considered. ■ It is also firmly established in our law that an abuse of discretion is never presumed but the complaining party must affirmatively establish it. (*Columbia Pictures Corp.* v. *DeToth,* 26 Cal.2d 753, 762 [161 P.2d 217, 162 A.L.R. 747] ; *In re Cook,* 67 Cal.App.2d 20, 24 [153 P.2d 578] ; *Berry* v. *Chaplin,* 74 Cal.App.2d 669, 672 [169 P.2d 453].) In the last cited case it is said at page 672, ''The burden is on the party complaining of the order to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice an appellate court will not substitute its opinion and thereby divest the trial court of its discretionary power.'' ■ All inferences reasonably deducible from the evidence and sur-

rounding circumstances will be indulged to uphold the order made. ██ In regulating the order of proof in the trial of cases a wide discretion is vested in the trial court (*Mayers* v. *Alexander*, 73 Cal.App.2d 752, 763 [167 P.2d 818]). In the case of *Kreling* v. *Walsh*, 77 Cal.App.2d 821, 836 [176 P.2d 965], this court, in commenting upon the application of section 597 of the Code of Civil Procedure, said:

"To us this case seems a most appropriate one in which the court was justified, when the special affirmative defense would dispose of the case without a long trial, to resort to the provisions of section 597 of the Code of Civil Procedure. As was said in *Booth* v. *Bond,* 56 Cal.App.2d 153, 156 [132 P.2d 520], 'The clause of section 597 of the Code of Civil Procedure we are considering does not seem to have added a great deal to powers of courts to regulate the order of proof under the provisions of section 2042 of the Code of Civil Procedure. Under the powers granted by that section it. has been held that trial courts had authority to hear special defenses that would bar a recovery by a plaintiff. (*Estate of Wickersham,* 153 Cal. 603 [96 P. 311] ; *Estate. of Smith,* 176 Cal. 729 [171 P. 289] ; *Smeland* v. *Renwick,* 50 Cal.App. 565 [196 P. 283].)' "

██ While the pleading situation with which we are here concerned does not completely fit into the pattern of section 597 of the Code of Civil Procedure in that by its terms that section relates only to a situation wherein a special defense is set up in an answer, while in the instant case we are confronted with the situation wherein the effect of the compromise agreement is set up and challenged in counts one and two of the cross-complaint, nevertheless, as pointed out in the last-cited case, section 597 of the Code of Civil Procedure is but a legislative recognition of the power of a trial court under section 2042 of the Code of Civil Procedure and places an imprimatur upon a practice which contemplates a trial first of the severable issues which if determined adversely to the plaintiff will obviate the necessity of a protracted trial of issues which by such determination are rendered irrelevant and immaterial. The rule in question is supported by reasons based upon the economical and speedy administration of justice.

We are persuaded that if the court in the present case was justified in concluding that by the compromise agreement a full and complete settlement had been made between the parties it would have been a needless consumption of time to

proceed with the trial of issues with respect to a controversy or controversies that were settled by the agreement, the validity of which was put in issue by counts one and two of the cross-complaint. The court was, therefore, authorized to first try the issue which, upon its determination, might result in rendering a further trial unnecessary.

Appellant complains that the procedure adopted by the court prevented her from presenting evidence with respect to the waiver which was attached to the will of her deceased husband. The court was justified in refusing to try the issues as to the existence and character of the waiver until it had determined the legal effect of the compromise agreement. Having found that the issues in respect to the waiver were comprehended within the settlement and were composed as between the parties by such settlement agreement, it became neither necessary or proper for the court to further occupy its time in trying issues which had thus been set at rest. The character and legal effect of the waiver furnished one of the reasons for the execution of the settlement agreement. The validity and scope of the waiver was not material in determining the validity of the compromise agreement. If this last-mentioned instrument was legal and valid then it became immaterial whether the property belonged to appellant as her sole and separate property as survivor of the joint tenancy, or whether, as contended by the second parties to the agreement, it was, by virtue of the waiver, community property. The compromise agreement was executed to settle a disputed claim, and as such is binding upon the parties.

The compromise of a doubtful right is a sufficient foundation for an agreement (*Bennett* v. *Bennett*, 219 Cal. 153, 159 [25 P.2d 426]; *Gardner* v. *Watson*, 170 Cal. 570, 575 [150 P. 994]). This is especially true where as here, legal proceedings to enforce or determine an asserted claim have been commenced, are pending, and the proceedings are dismissed or abandoned pursuant to such compromise agreement (*Union Collection Co.* v. *Buckman*, 150 Cal. 159, 163 [88 P. 708, 119 Am.St.Rep. 164, 11 Ann.Cas. 609, 9 L.R.A.N.S. 568]).

The dispute between the parties as to the legal effect of the waiver upon the property held in joint tenancy was injected as an issue in reference to claimed false representations set forth in paragraph XIII of the first count of the cross-complaint which was tried by the court. Therein it was alleged: ''that Cross-Defendants falsely and knowingly represented to Cross-Complainant that the properties held in

joint tenancy were in law and in fact community property under the said Waiver' of Cross-Complainant, Exhibit C, and that said properties belonged in the probate estate of said Isidor Silver, Deceased;.''

Upon this issue the trial court upon all of the evidence presented expressly found that the foregoing allegation was untrue. Furthermore, it was a representation of a conclusion of law and not a representation of fact. It could not therefore, constitute the basis for a claim of fraud (12 Cal.Jur. 731-732 citing numerous California cases).

Appellant next complains that the trial court erred in failing to make findings with reference to certain claimed material issues, viz., (a) ''The legal effect of the waiver,'' and (b) ''The legal character of the property held in joint tenancy.''

In view of the conclusion arrived at by us, to be later discussed, that the adjudication of the trial court that the compromise agreement was legal and binding and that the issues which appellant contends should have been litigated were comprehended within the scope of a valid compromise agreement, must be sustained, we must hold that the refusal of the trial court to try the issues of fact relating to the waiver and to the character of the joint tenancy property, and to thereafter make findings of fact and conclusions of law thereon, was proper. ■ It is established law in this state that a valid compromise agreement has many of the attributes of a judgment, and in the absence of a showing of fraud or undue influence, is decisive of the rights of the parties thereto. (*Credit Finance Corp.* v. *Mox*, 125 Cal.App. 583, 586 [13 P.2d 937] ; *Lamb* v. *Herndon*, 97 Cal.App. 193, 203 [275 P. 503] ; *Armstrong* v. *Sacramento Valley Realty Co.*, 179 Cal. 648, 650 [178 P. 516].)

■ The complaint in the declaratory relief action herein explicitly recites the issues existing between the parties. The existence and legal effect of the waiver were pleaded in the complaint and it was claimed by the plaintiff in the declaratory relief action that the appellant herein, Helen Silver, by and through the instrumentality of the waiver, had accepted and acquiesced in the provisions of the will as disposing of all of the property belonging to the spouses.

The recitals of the compromise agreement likewise set forth in detail and show particularly the contentions of Marc Silver that all of the joint tenancy property was community property, had been disposed of by the will of Isidor Silver and

distributed in accordance with the terms of the will. This contention was predicated upon the ground that the waiver attached to the will was a valid and effective instrumentality to produce that result. Respondents must therefore be upheld in their contention that all of the matters about which appellant claims that the court made no findings were comprehended within the terms of the compromise agreement and by it conclusively set at rest.

We come now to a consideration of appellant's claim that in the conduct of the trial on the merits as to counts one and two of the cross-complaint the court committed errors which necessitate a reversal of the judgment rendered.

The issues presented by counts one and two of the cross-complaint are not complicated or involved. Both counts seek the rescission of the foregoing agreement of settlement.

In count one it is alleged that for a period of approximately 11 months before and at the moment of the execution of the compromise agreement, the respondent Marc Silver kept his sister-in-law, appellant Helen Silver, in such an extremely distraught physical and mental condition by nightly injections of sedatives that she was incapacitated from doing any business or making any contract. That knowing she was in such a condition all of the respondents and cross-defendants by certain false representations, explicitly set forth, induced Helen Silver to execute the compromise agreement.

The issue as to count two was simply that the compromise agreement in question was not supported by an adequate consideration.

Counts one and two of the cross-complaint which were tried are actions in equity to set aside and cancel a contract of settlement. The only parties to this litigation who were parties to the contract are cross-complainant and appellant Helen Silver and cross-defendant and respondent Marc Silver. The remaining cross-defendants are joined as such upon the theory that they were actors in the alleged fraud.

In the further interest of clarity in connection with the discussion of the issue of fraud, it might be well to here say that there was substantial evidence that appellant Helen Silver named her brother Ben Bridge as her counsellor, if not her agent, in connection with the joint tenancy properties, and the estate of her deceased husband, and relied upon his advice. Immediately after the death of appellant's husband, her brother Ben Bridge came to Los Angeles, received a copy of the will from Joseph Shemanski, the executor thereunder,

discussed the contents thereof with the executor at appellant's home, and stated that if he could get a check from Mr. Shemanski for $250,000 he would like to take his sister, appellant, and go to his home in Seattle, Washington. The testimony of appellant amply supports the statement just made. We quote from her testimony as follows:

"Q. Did Mr. Alfred Shemanski represent you on that occasion? A. No, he did not.

"Q. You had not asked him to take any steps in the matter at all? A. No, Ben Bridge represented me, he is my brother.

"Q. Ben Bridge represented you? A. Yes.

"Q. And at that time you had great reliance in Ben Bridge, is that right? A. That's right.

"Q. And, do you recall, that at the conference when Mr. Alfred Shemanski was here, January, 1946, whether you made the statement at that conference that you would not come to any conclusion about the matter, until Ben Bridge came down here? A. That is right, sir.

"Q. You did make that statement at the time of that conference? A. Yes.

. . . . . . . . . .

"Q. Would it be correct to say that you were relying on your brother, Ben Bridge, to carry your side of the case and the conversation? A. That's right; he took over my responsibility.

"Q. And you were depending upon him entirely to represent you in the matter? A. That is correct.

"Q. And as a consequence, you paid little attention to the conversation itself? A. That is right, sir."

With reference to the power of attorney from appellant to Joseph Shemanski and the circumstances surrounding its execution, appellant's brother Ben Bridge testified:

"Q. Do you recall that it was suggested at that time, that because of the difference of the two kinds of tenancies, that Joseph Shemanski or someone should be appointed to look after all of the properties, both kinds? A. I think, Mr. Prichard, may I add first—yes, I asked that Joseph Shemanski would handle all of the property, no matter what category they came under.

"Q. Now, do you recall that it was stated that in order for him to handle the properties, that it would be necessary for him to have a Power of Attorney? A. Yes.

"Q. And, as a consequence, during the course of that week, immediately after the funeral, you took Helen Silver,

your sister, down to the office of Benjamin & Kronick and executed a general Power of Attorney to Joseph Shemanski, is that right? A. That is right.

. . . . . . . . . .

"Q. We are agreed on that. Now, isn't it also a fact that there was another conference in Mr. Benjamin's office the following day when you brought up Mrs. Silver and she signed the Power of Attorney? A. Yes, sir, you are right.

"Q. You were in our office on the second day? A. Yes.

"Q. And Mrs. Silver was present? A. Yes, she signed the Power of Attorney in your office.

. . . . . . . . . .

"Q. Now, isn't it a fact that at that time, Mr. Shemanski did not want to take over the responsibility of these properties and thought you should come down and look after that? A. Yes, he said that, and he asked me to, and I did not want to take care of them; he did not want to be Executor; and I was very insistent he should be.

"Q. And you were also insistent that he hold the joint tenancy properties? A. The whole thing.

"Q. Now, it was explained to you that there was a difference and he would need a Power of Attorney for him to handle the joint tenancy property? A. That's right."

It should also be pointed out with reference to the sale of 10 of the 15 parcels of property which stood in joint tenancy, appellant and her brother were aware of the fact that such properties had been listed with a broker who handled many of decedent's real estate transactions during his lifetime, that respondent Joseph Shemanski explained each transaction to appellant and that the latter personally signed all of the deeds for said 10 parcels of joint tenancy property. That appellant's brother was also advised of all contemplated sales, discussed them with her and urged her to accept Mr. Shemanski's statement as to the adequacy of prices obtained.

Regarding the claimed fraud, paragraph XIII of the cross-complaint charged:

"That Cross-Complainant on the 28th day of February, 1946, and for some time thereafter, and at all times since the death of her husband, Isidor Silver, on the 28th day of March, 1945, until the 28th day of February, 1946, was infirm physically, the nature of her infirmity being that she was in an extremely distraught physical and mental condition and was taking nightly injections of sedatives administered by a doctor provided for her by Cross-Defendant Marc Sil-

ver; that by reason thereof said Cross-Complainant was on February 28th, 1946, and at all times prior thereto, incapacitated from doing any business or making and entering into any contract whatsoever;.''

In this regard there was an evidentiary showing that after the death of her husband, appellant Helen Silver was prostrated with grief. For a few days after the death and the funeral she stayed with her brother-in-law, Marc Silver, the respondent herein, and his wife. Her condition was such that Marc called Dr. Rubin to attend her.

Five or seven days after her husband's death she went with her brother to Seattle. Marc Silver's doctor did not treat appellant while she was in Seattle. No other doctor treated appellant in Los Angeles at the time of her husband's death. Appellant was given sedatives until she left for Seattle. After appellant was in Seattle she continued to take a bottle of pills which had been prescribed by Dr. Rubin. She did not take overdoses. These lasted about a month.

In Seattle appellant went to Dr. Greinstein, who gave her something to build her up. Dr. Greinstein did not prescribe sedatives. Appellant never took any sedatives after the first month.

At the time of the compromise agreement in February, 1946, appellant was not taking sedatives. She just followed Dr. Greinstein's prescription to build her up.

Dr. Rubin did not treat appellant after April 7th. She returned to Los Angeles May 21, 1945.

While in Seattle appellant visited some lakes with her mother for about a month. She went to restore her health. It ''gave her quite a lift.''

While Helen Silver was in Seattle, her brother, Ben Bridge, wrote to Joseph Shemanski on April 28, 1945, saying, ''I am glad to be able to tell you that Helen is feeling 100% better and is beginning to look fine and get over a terrific nervous strain.''

Later, on May 19, 1945, Ben Bridge wrote again to Joseph Shemanski that ''Helen leaves Monday so should be back in L. A. by Wednesday night.'' Regarding her condition he said, ''I talked to Helen last night and I might add she is perfectly rational now and seems to remember many details that we tried to get out of her when I was in Los Angeles without avail.''

When appellant got back to Los Angeles she felt much better. Appellant then lived with a relative, Mrs. Nabor, on

Fairfax Avenue in Los Angeles. She seldom saw Marc Silver. During this time he did not employ a physician for appellant. She did not take sedatives. Marc Silver never furnished a physician for appellant after Dr. Rubin. At no time did Marc Silver furnish sedatives to appellant, following the few days after the death of appellant's husband.

In 1945, when appellant returned to Los Angeles she resided with a Mrs. Silverman.

Paragraph XIII of the cross-complaint then further charged: "that Cross-Complainant was wholly unfamiliar with the status, the amount, the character or descriptions and all facts concerning the assets of her husband's estate and of her rights and claims in and to all the real and personal properties standing in her name, or her name along with her husband's name, and her rights and interests therein and thereto;."

Paragraph XIII of the cross-complaint also charged: "that Cross-Defendants falsely and knowingly represented to Cross-Complainant that the properties held in joint tenancy were in law and in fact community property under the said 'Waiver' of Cross-Complainant, Exhibit C, and that said properties belonged in the probate estate of said Isidor Silver, Deceased; that Cross-Defendants further represented that if said properties were subjected to probate and the trust provisions of said Last Will and Testament and Fourth Codicil of Isidor Silver, Deceased, Cross-Complainant would receive only those moneys which were given her in and under the terms and provisions of said Last Will and Testament and Fourth Codicil of said Isidor Silver, Deceased;."

Appellant offered no evidence to substantiate these claims, which it might be pointed out, assert a position in the controversy which was compromised.

It was next charged "that cross-defendants further represented that the government appraisals of said properties was the approximate sum of $240,000."

Concerning this allegation, appellant Helen Silver positively testified that at no time did respondent Marc Silver tell her that the appraised value of the properties left by her husband, and particularly the joint tenancy properties, was $240,000, but that respondent Joseph Shemanski did. Regarding the $240,000 appraisal figure, appellant's brother Ben Bridge testified that respondent Silver never made any representation to him in that regard, but that it was his recol-

lection that the figure in question was obtained by him from Alfred Shemanski in Seattle, Washington.

The cross-complaint next charged: "that it was further falsely and fraudulently represented to Cross-Complainant that Cross-Defendant Marc Silver was executing the agreement and settling the matter for Jetka Zawadski, Rachella Buistyn and Sala Dach, who were sisters of said Isidor Silver, Deceased, and who were named in the Last Will and Testament of said Isidor Silver, Deceased, as beneficiaries under the trust provisions therein created;."

Concerning these allegations there was testimony by appellant's brother and agent as follows:

"Q. Do you recall also that there was a discussion regarding the fact that Marc Silver should act as a Trustee for his three sisters, who were in Poland, until it could be ascertained whether they were dead or not? A. Yes, I think that was stated, but I did not bother about it.

"Q. That was not a matter of very great moment at the time? A. No.

"Q. Except that you wanted to be sure that you would be protected in this, because Marc Silver would be representing those people and he would be responsible to them if something went wrong? A. So far as Marc Silver was concerned, all right. I looked to Joseph Shemanski to protect my sister's interests and the interest in the trust there; that Marc Silver would take care of his sisters in Europe."

The compromise agreement specifically sets forth that the sisters had not been heard from for approximately seven years. There was also testimony by appellant and her brother that at the time of the execution of the compromise agreement, both appellant and respondent Marc Silver, the only parties to the agreement, believed that the sisters in Poland and their children were dead, following a search made for them. Later, in an affidavit made by her in the probate proceeding, appellant stated under oath that she and Marc Silver were the only living heirs.

Under the fourth paragraph of the agreement a trust was created whereby Marc Silver was made trustee for said sisters and their children, should it be ascertained that any of them were alive. The elements of a valid trust as set forth in sections 2221 and 2222 of the Civil Code were contained in this paragraph.

It would appear that at the time appellant filed her cross-complaint the presumption of death of the sisters had arisen.

(Code Civ. Proc., § 1963, subd. 26.) It is asserted in one of respondents' briefs, and undenied by appellant; that since the trial of this action, a decree has been entered in the matter of the estate of Isidor Silver, deceased, which file was admitted into evidence, and which decree established the death of the three sisters and their issue. That such decree is now final.

Concerning the allegation "that cross-defendants falsely and fraudulently represented to cross-complainant that there were only five parcels of property held in joint tenancy and tenancy in common," both appellant and her brother testified that respondent Silver at no time made such a representation.

Concerning the charge contained in the cross-complaint, "that it was further falsely and fraudulently represented to Cross-Complainant that it was for her best interests to accept the offer of Cross-Defendant Marc Silver to give her the sum of $95,000.00 for all her right, title and interest in and to said properties held in joint tenancy and tenancy in common, both real and personal, and wheresoever situated, and all income therefrom.," appellant testified as follows:

"Q. Did Marc Silver at any time, either in this conversation which was in the latter part of February, 1946, or at any other time, ever tell you that it was to your best interests to take $95,000? A. No, he did not."

Regarding the conference leading to the compromise she testified regarding Marc Silver:

"Q. Did he, or anybody else, say to you that it was for your best interests to take the $95,000? A. They never used that figure of speech. They just said $95,000 he was going to go, and then he arose, and he left the room, Marc. That is all I know about it.

"Q. And did you talk with Ben at that time as to whether you would take the $95,000? A. I said, 'Well, if that is the best he is going to do, then that is all there was to it.'

"Q. Did you have a conversation in which Ben urged you to take the $95,000? A. Ben never urged me.

"Q. He never did? Did he suggest to you as to what he thought was for your best interests? A. He didn't suggest— he just—what do you call it? Reached that conversation, and 'What do you want to do about it?'

"Q. And what did you say? A. I said, 'If that is the best they agree upon, it is all right.'

540

"Q. Did Marc make any statement to you in which he urged you to take $95,000, and told you it was to your best interests to take $95,000? A. No."

On the same issue appellant's brother Ben Bridge testified that in offering the compromise sum of $95,000, respondent Marc Silver said, "Well, if she don't accept the $95,000.00 he will go to court and she will get nothing," and insisted, "that was as far as he would go in his offers to compromise the matter"; "that she would either accept the $95,000.00 or he would urge the contention that he was making, that it all go into the estate."

Appellant next urges that material findings of fact are irreconcilably conflicting and therefore erroneous. This contention must be weighed and considered in the light of the established principle of law that all the findings made must be read together and so construed as to uphold rather than to defeat the judgment. Bearing that rule in mind, the findings must be liberally construed, and wherever reasonably possible, any inconsistency therein must be resolved, if reasonably possible, in favor of sustaining the judgment (*Davis v. Stulman,* 72 Cal.App.2d 255, 262 [164 P.2d 787]). Before a judgment may be set aside on the ground now under consideration, the conflict in the findings must be clear, irreconcilable and material (*Epstein* v. *Gradowitz,* 76 Cal.App. 29, 31 [243 P. 877] ; *Castello* v. *Bowen,* 80 Cal.App.2d 621, 631 [182 P.2d 615]).

Appellant insists that findings XX and XI on the issue of advice given to appellant are in conflict, but a reading of the two findings shows that they relate to two different periods of time, during one of which it was found that appellant relied upon the advice of her agent Joseph Shemanski, while during the other period which encompassed the period during which the compromise agreement was negotiated appellant relied upon nobody other than her brother Ben Bridge. We perceive no conflict in the two findings.

It is next asserted that findings XI and XV are in conflict. By the first of these findings the court found that none of the cross-defendants conspired together to cheat or defraud appellant or to persuade her to give up any claim she might have to the properties in question. The last-mentioned finding declares that the controversy set forth in the declaratory relief action "was produced by the contention and position asserted by the said Marc Silver in the complaint for declaratory relief in the above entitled action."

Appellant argues that in her cross-complaint she had alleged that she was induced to execute the compromise agreement by the false representation that there was a controversy. As a matter of fact, by her answer in the declaratory relief action, appellant admits the existence of a controversy by her failure to deny Marc Silver's allegation of its existence. There was no inconsistency between a finding that there was a controversy and a finding that there was no fraud.

Appellant next attacks as inconsistent the findings on the issue of the confidential relationship, asserting that in three findings the court found that no confidential relationship existed between respondents and appellant, while in three others it was found that respondents Benjamin and Kronick, as attorneys, represented appellant and her agent Joseph Shemanski in matters concerning the joint tenancy properties, and represented her in drawing the compromise agreement, which also concerns the joint tenancy properties. When read in their entirety we find no inconsistency in the findings. Certain of them relate to certain cross-defendants and to certain periods of time. Insofar as the important and critical period of time within which the agreement of settlement was negotiated and executed, the findings are clear and unequivocal that there was no fraud practiced upon appellant by respondents. Whatever minor inconsistencies may exist when the findings are separately read, do not militate against the conclusion that when read as a whole there is no inconsistency, and that taken in their entirety they clearly support the judgment based upon them that appellant was not the victim of any fraud practiced upon her by respondents.

Appellant claims an inconsistency between findings VI and XIV. In the first the court referred to the waiver as a "purported waiver," and in the second, which relates to the participation of attorneys Benjamin, Lieberman and Elmore in the entire episode, the court found that these attorneys did not have anything whatsoever to do with the execution of the waiver "signed by the cross-complainant Helen Silver" without using the word "purportedly."

Standing alone these two findings might be regarded as inconsistent, but when read together, and in conjunction with other findings, it is at once apparent by finding XIV the trial court was not attempting to decide whether appellant did or did not sign the waiver, but was rather deciding that attorneys Benjamin, Lieberman and Elmore had nothing

whatever to do with the execution of the waiver regardless of who may have signed it. The trial court expressly declared that because of its determination that the compromise agreement was valid "the court therefore has not tried the issues of fact presented by the pleadings with respect to (Counts Three, Four and Five) and makes no findings of fact or conclusions of law with respect thereto." In counts three, four and five the issues regarding the waiver are set out. By the language quoted the trial court has construed finding XIV and has declared that it is not a finding regarding the question as to the execution of the waiver.

Appellant assails findings XXI and VII on the issue of the inclusion of the joint tenancy properties in the probate estate as inconsistent. In the first-mentioned finding the court found that all of the allegations of a paragraph of the cross-complaint "not expressly found to be true are untrue." Appellant then points out that in findings VII and VIII certain of the allegations of this same paragraph of the cross-complaint are expressly found to be true. As pointed out by respondent Marc Silver in his brief, "there is no inconsistency. It is only where there was a complete lack of express finding of truth that there was a finding of untruth. Instead of being inconsistent the findings perfectly agree."

We have heretofore discussed the question presented upon this appeal from the standpoint of their application in the main to respondent Marc Silver because he was the only respondent who was a party to the compromise agreement with appellant Helen Silver. However, insofar as the contention of appellant that the court erred in first trying the issues framed by counts one and two of the cross-complaint, and in then concluding that the determination arrived at concerning these two counts obviated the necessity of any further trial is concerned, the foregoing conclusion at which we have arrived is applicable to all respondents. The same is true as to the claim of material conflict in the findings.

Before proceeding to a discussion of appellant's claim that the findings of fact are not supported by the evidence, we deem it advisable to discuss more in detail the evidence insofar as it concerns the respondents other than Marc Silver.

As to respondent Joseph Shemanski, he was executor of the estate of Isidor Silver, deceased, and respondents Paul P. Benjamin and Robert I. Kronick were his attorneys. When respondent Shemanski took over the properties belonging to

the estate and those in joint tenancy, he hired accountants and set up two complete sets of books, one for the estate properties and one for the joint tenancy properties. There is testimony that in these records he caused to be entered each item of income and expense relating to the two respective properties. At all times these records were open to appellant and her brother and advisor Ben Bridge. These records were produced at the trial where examination thereof failed to disclose any evidence of money derived either from sales or income from the joint tenancy property having been dissipated, or unaccounted for. The methods pursued by the executor in connection with the sale of joint tenancy property, his correspondence with Ben Bridge, keeping him advised thereof, have heretofore been narrated and need not now be repeated. There was also evidence that respondent executor, prior to his departure for Europe on July 20, 1945, had many conferences with appellant and advised with her concerning the sales of joint tenancy properties. Appellant also came to the law offices of respondents Benjamin & Kronick on numerous occasions to sign documents in connection with these transactions. The monies derived from such sales were deposited in a bank account standing in the name of appellant. During the absence of respondent executor in Europe from July 20 to December 10, 1945, a considerable number of transactions involving real estate sales were consummated by appellant herself with the assistance of Benjamin & Kronick, attorneys for the executor. We have already detailed what transpired at the meeting of January 18, 1945, wherein appellant stated she would do nothing until her brother Ben Bridge came to Los Angeles from Seattle, Washington. It is also unnecessary to again narrate what transpired at the meetings commencing about February 26, 1946, after the arrival of appellant's brother, and which culminated in the execution of the compromise agreement, other than to say that respondent attorneys Benjamin & Kronick advised appellant and respondent Marc Silver that as their interests were diverse, said attorneys, because they were attorneys for the estate, could not represent either appellant or respondent Silver and requested them to obtain independent counsel. This they refused to do and insisted that respondent attorneys Benjamin & Kronick prepare the agreement in accordance with the terms and conditions agreed upon in the discussions. Again, when the compromise agreement had

been prepared and was ready for execution, the attorneys requested appellant and respondent Marc Silver, the parties to such agreement, to consult with other counsel, and again they refused so to do. It is undisputed, as heretofore set forth, that appellant named her brother as her advisor and relied upon his recommendations and judgment.

The total absence of fraud upon the part of respondent executor Joseph Shemanski in receiving from appellant a power of attorney to handle the joint tenancy properties has heretofore been demonstrated by quotations from appellant's and her brother's testimony. We feel justified in saying that the record herein warrants the statement that if appellant was unaware of the nature and values of the joint tenancy properties sold, it was not because the same was not explained to her. This is also true of the appraised value of the assets of the estate and the joint tenancy properties. The acceptance by appellant of $95,000 under the compromise agreement settlement was not in any way influenced by respondent executor or his attorneys but was the outgrowth of negotiations between respondent Marc Silver, appellant, and her brother.

It is true that it was the opinion of respondent attorneys for the estate, Benjamin & Kronick, that under the terms of the will and the waiver attached thereto, the joint tenancy property was community property. This was at least a debatable question and certainly there was no fraud in the expression of this opinion. There is creditable authority for the statement that evidence is admissible to show that husband and wife who took property as joint tenants actually intended it to be community property (*Tomaier* v. *Tomaier*, 23 Cal.2d 754, 757 [146 P.2d 905]; *Estate of Watkins*, 16 Cal. 2d 793, 797 [108 P.2d 417, 109 P.2d 1]; *Estate of Wilson*, 64 Cal.App.2d 123, 127 [148 P.2d 390]).

Where as here, the question of the character of the respective properties was debatable, it was the duty of respondent attorneys for the executor to advise their client what, in their judgment, after an honest search of the authorities, was the character of such properties, and to urge their client's claim upon the court unless such claim be otherwise settled or compromised. There was no confidential relationship existing between respondent attorneys Benjamin & Kronick and appellant. As heretofore pointed out, they advised her and her brother, upon whose judgment she relied, that they could not represent her and urged her to avail herself of independent legal counsel, which both she and her brother refused to do.

 We come now to a consideration of the evidence insofar as it affects the respondents I. B. Benjamin, Jacob J. Lieberman and Aaron Elmore. These respondents are attorneys-at-law and members of the law firm which represented respondent Marc Silver when on October 29, 1945, he instituted the declaratory relief action now engaging our attention. These respondent attorneys did not in any way participate in the preparation or execution of the aforesaid compromise agreement. About a year after the filing of the complaint in the declaratory relief action, and some nine months after the agreement of settlement and compromise had been entered into, appellant Helen Silver, a defendant in the declaratory relief action, filed her cross-complaint therein. Attorney Jacob J. Lieberman of this firm of attorneys was not served with summons on the cross-complaint, and the law firm of Bodkin, Breslin and Luddy and S. V. O. Pritchard were substituted as attorneys for Marc Silver, plaintiff in the declaratory relief action after service upon him of the aforesaid cross-complaint. Attorneys I. B. Benjamin and Aaron Elmore of the above named law firm therefore, appear herein solely as parties, cross-defendants and respondents.

Respondent Marc Silver, at the suggestion of his cousin who had been a client of this firm consulted them with a view to protecting his interests and because he was "not satisfied with the manner in which discussions (concerning the estate) were proceeding between Mr. Bridge and Mrs. Silver." Respondent Marc Silver consulted with attorney Elmore of the above firm with the result that the declaratory relief action was filed. The purpose of this action has heretofore been detailed.

A reading of the record herein prompts us to acquiesce in the statement of these respondents made in their brief as follows:

"Solely by reason of their single act in filing the Complaint for Declaratory Relief, Helen Silver, whom the members of the firm neither met, spoke with, nor communicated with, at any time, named as cross-defendants the members of the law firm, accusing them of participating in a fraud.

"The findings of fact, conclusions of law, and judgment were in favor of all cross-defendants and respondents, including I. B. Benjamin and Aaron Elmore.

"The evidence not only overwhelmingly supported and compelled such findings as to these respondents, but any other decision, on the evidence, would have been fantastic."

A perusal of the complaint filed in the declaratory relief action, appellant Helen Silver's answer thereto, and her cross-complaint, coupled with the evidence adduced at the trial immediately dispels any suspicion of fraud on the part of respondents I. B. Benjamin and Aaron Elmore. They filed a simple declaratory relief action. That an actual controversy existed between the parties to the declaratory relief action with respect to whether the properties held in joint tenancy were part of the estate or were the separate properties of appellant Helen Silver is obvious. The recitals in the compromise agreement affirm the existence of such controversy, and by failing to answer the allegation in the declaratory relief action complaint averring the existence of such a controversy, appellant herein admitted the same. Certain innuendoes contained in appellant's brief with reference to these respondents find a ready answer in the statement that the law presumes that a person is innocent of crime or wrong, and that presumption must be overcome by him who alleges improper conduct. Evidence of the facts and circumstances taken together, must amount to proof of fraud and not to a mere suspicion thereof (*Arakelian* v. *Sears*, 53 Cal.App. 646, 653 [200 P. 757] ; *Ryder* v. *Bamberger*, 172 Cal. 791, 799, 800 [158 P. 753]).

From time immemorial it has been the duty of an attorney to file what he believes to be a meritorious cause of action. The complaint filed by these respondents merely alleged the admitted existence of a controversy and sought a declaration of rights with reference to the properties involved. The rule in this regard was thus stated by this court in *Murdock* v. *Gerth*, 65 Cal.App.2d 170, 179 [150 P.2d 489] :

"It would be inimical to the administration of justice if an attorney were to be held liable to a malicious prosecution action where, after an honest, industrious search of the authorities, upon facts stated to him by his client, he advises the latter that he has a good cause of action, although the courts upon a trial of such action decide that the attorney's judgment was erroneous. If the issue which the attorney is called upon to decide is fairly debatable, then under his oath of office, he is not only authorized but obligated to present and urge his client's claim upon the court. And if it subsequently is determined that the position honestly taken by the attorney was erroneous he should be relieved from responsibility."

The motivating cause for joining these respondents, attorneys Benjamin and Elmore as cross-defendants in appellant's

cross-complaint is to a large degree revealed in the following episode which occurred at the trial. When appellant Helen Silver was testifying she was asked whether she was acquainted with respondents I. B. Benjamin and Aaron Elmore or their partner Jacob Lieberman who was named as a cross-defendant but was not served with process. Appellant answered that she had never met respondent I. B. Benjamin or Aaron Elmore, and as to cross-defendant attorney Jacob J. Lieberman, she answered, "Well, I was introduced to him, that was all."

We now quote from the reporter's transcript:

"Q. Did any of those named gentlemen ever make any statement to you with reference to the matter we are now arguing about here? A. No.

"MR. BODKIN (one of respondent Silver's attorneys) : Are you willing to dismiss the case as to those three defendants?

"MR. MURPHY (attorney for appellant Helen Silver) : We are going to call them and have them testify, but as soon as they do, we will dismiss."

The appeal from the judgment in favor of these last named respondents is utterly devoid of merit.

We come now to a consideration of appellant's next contention that certain material findings of fact and conclusions of law are not supported by the evidence, and that consequently the judgment based thereon is erroneous.

Legion of authority supports the statement that when an attack is made upon findings or a judgment on the ground that they or it are or is not supported by the evidence, the power of reviewing courts is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, which will sustain the findings made or the judgment rendered. Before we are warranted in reversing the judgment rendered herein, it must appear from the record that, accepting the full force of the evidence adduced, together with every inference favorable to respondents which may be drawn therefrom, and excluding all evidence in conflict therewith, it still appears that the law precludes the finding or findings which were made.

Bearing in mind the rule just enunciated, we proceed to an analysis of appellant's contentions.

A. The finding that the property in joint tenancy was divided between the heirs of Isidor Silver, deceased, is supported by testimony given at the trial as to the existence or nonexistence of the sisters of decedent who lived in Poland,

and who at the time of trial had not been heard from for seven years. Respondent Joseph Shemanski testified as to what had been done in a fruitless endeavor to locate said heirs. And, as heretofore pointed out, there is now a final decree in the probate file referred to by appellant in her brief, establishing that the aforesaid sisters and their children are dead. Appellant herself also filed an affidavit in the probate proceeding wherein she averred that she and respondent Marc Silver are the only principal legatees alive. The will of decedent shows that after a few more or less minor bequests for the payment of which the estate possessed ample funds, the bulk of the estate was placed in a trust, the beneficiaries of which were appellant, respondent Marc Silver, and the latter's three sisters. Everyone entitled to receive under the will of decedent was assured of his or her portion from the estate.

B. Appellant's next attack is upon what she terms a finding ''that Marc Silver had legal authority to act for the persons for whom he purported to act.'' There was no direct finding to that effect. The contention that such a finding was made is predicated on the fact that paragraph 15 of the cross-complaint contains an allegation ''that said cross-defendant Marc Silver had no legal authority to act, either by authority of the person or persons themselves, or by any order or decree of the probate court for or on behalf of the three sisters of decedent,'' and that the court made a finding ''each and all of the allegations contained in paragraph 15 of the first count of the cross-complaint not expressly found to be true are untrue.'' It cannot be assumed from such finding that it was intended thereby to find that respondent Marc Silver was without authority to act for his sisters because the evidence without conflict shows that in executing the compromise agreement respondent Marc Silver did not act on behalf of anyone but himself. The terms of the compromise agreement clearly show that Marc Silver executed a simple unilateral declaration of trust in favor of his sisters if they be living, and for the benefit of the child or children of any deceased sister. At the time the compromise agreement was executed, seven years had not elapsed since the sisters in Poland had been heard from. The agreement shows that respondent Marc Silver represented himself alone. It is not essential to the existence of a valid trust that the beneficiary should have notice at the time of the creation thereof or that the beneficiary should consent to the trust or expressly accept

it (*Booth* v. *Oakland Bank of Savings*, 122 Cal. 19 [54 P. 370]; *Cahlan* v. *Bank of Lassen County*, 11 Cal.App. 533 [105 P. 765]; 65 C. J. 316-317; 54 Am.Jur. 121). It therefore follows that if any specific finding were to be made concerning the foregoing allegations of the cross-complaint, such finding would of necessity, under the evidence, be adverse to appellant.

C. Appellant next assails the findings relating to conspiracy and fraud. When the testimony is read in its entirety, and from a consideration of the factual consideration to which we have hereinbefore alluded, it is manifest that to hold that either a conspiracy or fraud were proven we would, as this court stated in *Neblett* v. *Elliott*, 46 Cal. App.2d 294, 306 [115 P.2d 872], be called upon to "roam in the fields of suspicion, conjecture and surmise" to stigmatize these respondents with guilty knowledge and wilful intent to injure appellant. The trial court was the exclusive judge of the weight to be given to the evidence, and the presumption being in favor of honesty and fair dealing, the burden is on the party asserting fraud or conspiracy to prove the same by substantial evidence, and facts and circumstances must be shown that give rise at least to a reasonable inference of fraud, and not a mere suspicion thereof. The findings on the issues of fraud and conspiracy find substantial support in the evidence.

Appellant's attack upon the finding on the issue of confidential relationship is futile. From the evidence hereinbefore narrated it is manifest that appellant did not bring herself within the rule with respect to confidential relationship. If it be assumed that a confidential relationship existed between appellant and respondent attorneys for the estate, Benjamin & Kronick, who acted for appellant in proceedings which terminated the joint tenancy, such relationship ended when the controversy arose between appellant and respondent Marc Silver not over any matter in connection with which said respondent attorneys had represented appellant, at which time respondent attorneys Benjamin & Kronick advised both appellant and respondent Silver that the attorneys were acting only for the executor, could not represent either appellant or respondent Silver, and urged them on two separate occasions to obtain other counsel, which they refused to do. The executor and his attorney took the only position they could under the law, that of being impartial. Furthermore,

the court found on substantial evidence that no fraud was perpetrated upon appellant. The existence of a confidential relationship assumes importance only when through a transaction the person trusted has gained an advantage over the person trusting him.

Appellant's contention that the findings on the issue of consideration and the legality of the compromise agreement are contrary to the evidence and the law is equally without merit. The settlement and compromise agreement were executed by but two parties, appellant Helen Silver and respondent Marc Silver, both proper parties. When considered in its entirety the contract reveals that respondent Marc Silver shall be a trustee for his sisters and for any of their children "for any interest they may have in the joint tenancy property." Furthermore, since by decree of the probate court the death of the sisters and their children has been judicially established, the only remaining principal beneficiaries are appellant and respondent Marc Silver. Even though the sisters or their children were living, the agreement provides that their share is held by respondent Marc Silver as a trustee for them. The fact that the sisters or the executor of the estate might appear and contend that the joint tenancy property was in fact community property does not make the contract here in question invalid. The compromise settlement agreement does not impinge upon the provisions of section 1667 of the Civil Code. It does not in any manner seek to bind either the executor or the courts. It was merely a contract to compromise pending litigation, terminate existing disputes, and conforms to a policy in that regard favored by the law.

Contrary to appellant's contention, the compromise agreement here in question is supported by a valid consideration. By the terms of the agreement appellant was to receive $95,000 in cash, abandonment by respondent Marc Silver of the declaratory relief action instituted by him, his agreement to pay all state and federal taxes after January 1, 1945, to pay all attorneys' fees and other costs of administering the joint tenancy properties, all state inheritance and federal estate taxes, and other benefits not necessary to here set forth. We find nothing unconscionable or inadequate about the consideration. The court found that appellant acted freely and voluntarily in executing the compromise agreement. She was, as the court found, and we have hereinbefore set forth, urged to secure independent counsel, which she refused to do.

The finding of the court that appellant "acted freely and voluntarily and upon the advice and counsel of her brother, Ben Bridge, in whom she reposed her confidence, and did not rely upon the advice or representations of any other person as to whether said agreement was advantageous to her" is amply supported by the evidence. That she has now come to the conclusion that she made a bad bargain does not entitle her to ask a court of equity to assist her in the making of a better bargain.

Finally, appellant asserts that the judgment as entered was erroneous because it was merely a judgment of dismissal, and does not therefore, dispose of the litigation on its merits. With this contention we cannot concur because the determination by the trial court that the compromise agreement was valid and binding, and that by its terms a "dismissal" of the present action was required, was the result of a trial on the merits. Having determined the validity of the compromise agreement and that by it all of the remaining issues were settled, the court properly refused to try any of such other issues, and with equal propriety, in conformity with the provisions of the valid agreement, dismissed the declaratory relief action in which the appellant's cross-complaint for rescission of the compromise agreement was filed.

The evidence supports the findings, the findings support the judgment, no prejudicial error appears in the record, and the judgment should therefore, be affirmed. It is so ordered.

Doran, J., concurred.

York, P. J., concurred in the conclusion reached.