Filed 7/7/23  In re S.A. CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re S.A. et al., Persons Coming Under the Juvenile Court Law. | D081742 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. J521152A-B) |
| v. | |
| T.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

T.C. (Mother) appeals the juvenile court's dispositional order regarding her two minor children, S.A. and B.A. She contends the juvenile court abused its discretion by ordering her to submit to random drug testing as part of her reunification plan. We conclude the drug testing requirement was not an abuse of discretion and affirm.

FACTUAL AND PROCEDURAL BACKGROUND[1]

Between 2009 and 2022, the San Diego County Health and Human Services Agency (Agency) received 69 child abuse hotline calls concerning Mother's erratic behavior, auditory and visual hallucinations, possible drug use, homelessness, and neglect of her four children. This appeal concerns two of those children, six-year-old B.A. and eight-year-old S.A. (collectively, the children).[2]

In March 2022, the Agency received a referral alleging that S.A. and B.A. appeared "extremely dirty, malnourished, and hungry," that Mother was "incoherent and out of it," and that S.A. had reported seeing E.A. (Father)[3] "poke [Mother] with needles." Referrals in September and October 2022 reported concerns that Mother "may be using drugs" and about Mother's "mental health and/or substance abuse, which [wa]s impairing her ability to care for the children." These referrals, as well as many others between 2021 and 2022, were closed as "inconclusive" due to Mother's refusal to cooperate with the Agency and provide access to the children.

---

[1]  Because Mother's only contention on appeal concerns the reunification plan's drug testing component, we limit our factual background accordingly.

[2]  Mother no longer has custody of her other two children, neither of whom is the subject of this appeal.

[3]  Because Father is not a party to this appeal, we discuss him only as needed.

The Agency received another referral on November 24, 2022, alleging that a bystander saw Mother at a public park forcing B.A.'s face into a high-pressure waterjet for approximately three to five seconds. Mother released B.A. only after the bystander yelled at her, but then pushed B.A. down a step where he landed on his back. Witnesses reported that Mother had thrown B.A. "like a ragdoll" and "slammed [him] to the ground," and they described Mother's forcing B.A.'s face into the waterjet as like "drowning." Both S.A. and B.A. were "crying through the ordeal," but when law enforcement arrived, B.A. had only a small scratch. Mother was "nonchalant and told law enforcement to call [the Agency]."

Four days later, the Agency received yet another referral, this time alleging that the children arrived to a transitional housing center appearing lethargic and with "their eyes rolled back" in their heads. Shelter staff made the referral because they were concerned the children had been exposed to drugs. Witnesses overheard Mother coaching the children on what to say to law enforcement and the Agency. When two social workers introduced themselves to Mother, she "immediately stated that neither she nor the children were on drugs," and she was "adamant that the Agency [wa]s involved due to allegations of . . . her children being under the influence and people making false reports."

The Agency interviewed the children, who wore the same clothing they had been wearing four days earlier during the park incident. Their clothing appeared dirty and stained; dirt covered the children's legs, feet, and nails; and they reported taking turns wearing the one pair of shoes they shared. The children reported having eaten dinner the previous night, but they appeared dishonest in their responses and both said they were starving. During the interview, S.A. disclosed that Mother hit her in the face and

"abuse[d]" B.A. S.A. also shared that she "saw a little thing of white powder [with Mother]. Baking powder and I think it was drugs. It was little white stuff. It was in a little bag." She stated that Mother put it in water and her tummy felt better, and that Mother "does baking powder for her lungs and drinks it." The social worker asked S.A. what happens when Mother is mad, and she responded that Mother sees ghosts and looks at the wall. She demonstrated Mother's behavior by opening her eyes wide, blankly staring, and stating, "It's the ghost of the demon."

Meanwhile, B.A. shared that Mother tells him she hates him. He also shared that Father uses pills, which he gives to the children. He stated that S.A. gave him her pill, and it made him feel "bad" with a "really hurting" stomach. B.A. denied that Mother gave him pills.

When the Agency removed the children from Mother, S.A. was "extremely upset, screaming, yelling, banging on the car window while driving on the freeway, unclipping her seat belt and attempting to unlock the car door and windows." B.A. "follow[ed]" his sister's behavior. S.A. told the Agency that she took care of Mother and protected her.

During its investigation, the Agency interviewed several of the children's family members. The Agency interviewed paternal grandmother, who reported that Father could not care for the children, had a history of heroin and methamphetamine use, and was on parole. She noted that Mother and Father were not in a relationship, and she was unsure of Father's mental health stability.

Maternal great-grandmother told the Agency that Mother and the children had been in and out of her home for years, that she could not remember the last time she had contact with Mother, and that she did not trust Mother. She said Mother used drugs as a teenager, but she was

4

unaware of Mother using drugs as an adult. She shared that Mother was diagnosed in kindergarten with developmental delays and a learning disorder, and when she was 12 years old, Mother's mother overdosed on heroin and died. During a second interview, maternal great-grandmother reported that Mother has auditory and visual hallucinations and is often "in another world" in which she sits in a chair and does not talk to anyone, makes unusual facial expressions, and only wants to talk about the devil.

The Agency also interviewed G.C., the father of Mother's two other children, and asked him about any concerns over Mother's mental health or substance use. He responded that he had never known Mother to use drugs but that her mental health had "slipped over the last few years." He and Mother were in a relationship 10 years ago, but he did not know what happened and was hesitant to provide details about his view on her mental health.

On November 30, 2022, the Agency petitioned the juvenile court under Welfare and Institutions Code[4] section 300, subdivisions (a) and (j) on behalf of B.A. and S.A. The Agency alleged that Mother used excessive discipline by holding B.A.'s head under the waterjet stream at the park and pushing him down the stairs. At the detention hearing, the juvenile court detained the children in out-of-home care, and ordered voluntary services and supervised visitation for Mother.

The Agency spoke with Mother several times in December, but she declined setting up a meeting with the social worker, participating in any services, or providing a drug test. She also repeatedly denied having any substance abuse problems.

---

[4] Undesignated statutory references are to the Welfare and Institutions Code.

The Agency proposed a case plan for Mother that included psychological testing, a child abuse group, a parenting education program, and random drug testing. In its December 20, 2022 jurisdiction/disposition report, the Agency noted "concerns for possible substance use of which [Mother] denies" and noted that Mother had declined to drug test for the Agency to alleviate those concerns. The Agency asked Mother to drug test again in early January 2023. She again refused, stating, "I am not a drug addict, why would I drug test."

Meanwhile, the Agency located Father in custody and interviewed him. Father had difficulty focusing during the conversation, frequently changed topics, and often had to be asked to clarify what he was saying. He reported using methamphetamine "recreationally" every other day. When asked about Mother's substance use, he stated that he and Mother "used to use drugs together years ago, however now [Mother] does not like them." When asked about his relationship with Mother, he said they were in a relationship for two years, but he also made contradictory statements about their relationship's timeline. Father denied having any concerns about Mother's mental health and described her as "bright."

In the months leading up to trial, Mother continued to decline services and often missed visits with the children, including not visiting them for several weeks at a time. During the same period, the children reported more information about their lives with Mother, including their belief that they were removed from Mother because she gave them drugs. S.A. additionally shared that Mother gave them pills that would cause them to sleep, which B.A. characterized as Mother "putting them to bed early."

At the February 17, 2023 contested jurisdiction and disposition hearing, the juvenile court received Agency reports into evidence without

6

objection and heard testimony from Mother.[5]  The Agency's updated proposed case plan again included a random drug testing component.  During Mother's examination, her attorney asked if she believed it was appropriate for the Agency to randomly drug test her, and Mother answered that she was "not a drug addict" and did not "know why [she] would be tested."  Mother's attorney similarly argued to the juvenile court that Mother should not have to randomly drug test because she was not a drug addict.

After considering the evidence and the parties' arguments, the juvenile court found the allegations true, removed custody from Mother, and entered further dispositional findings and orders, which included finding Mother's case plan to be appropriate and ordering her to comply with it.  Mother appeals, challenging only the case plan's requirement that she submit to random drug testing.

DISCUSSION

Mother contends the juvenile court erred by requiring her to submit to drug testing as part of her case plan.  We disagree.

"At the dispositional hearing, the juvenile court must order child welfare services for the [children] and the [children']s parents to facilitate reunification of the family."  (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 (*Christopher H.*).)  "The juvenile court has broad discretion to determine what would best serve and protect the [children's] interests and to fashion a dispositional order accordingly."  (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.)  Although such orders must be "designed to eliminate those conditions that led to the court's finding that the child is a person described by section 300" (§ 362, subd. (d)), "[t]he problem that the juvenile

_____

[5]     The admitted Agency reports were dated December 1, 2022; December 22, 2022; January 12, 2023; February 2, 2023; and February 17, 2023.

court seeks to address [with a dispositional order] need not be described in the sustained section 300 petition." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311 (*Briana V.*).) Accordingly, "when the court is aware of other deficiencies that impede the parent's ability to reunify with his [or her] child, the court may address them in the reunification plan." (*Christopher H.*, at p. 1008.)

We review dispositional orders for an abuse of discretion. (*Christopher H.*, *supra*, 50 Cal.App.4th at p. 1006; *In re Neil D.* (2007) 155 Cal.App.4th 219, 226 [applying abuse of discretion standard to mother's argument that the juvenile court erred in requiring her to participate in an inpatient drug program].) It is appellant's burden to affirmatively establish an abuse of discretion (*Silver v. Shemanski* (1949) 89 Cal.App.2d 520, 529), which we can find only where the juvenile court has exceeded the bounds of reason by making an arbitrary, capricious, or patently absurd ruling, *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.

Here, we conclude the case plan's drug testing requirement constituted a reasonable exercise of discretion tailored to advancing the children's best interests. The evidence showed that Mother had significant and chronic mental health challenges—including auditory and visual delusions and erratic behavior—all of which appeared to contribute to her ongoing neglect and abuse of the children. Reports by witnesses and the children, themselves, reasonably suggested that substance abuse could be a factor contributing to Mother's unexplained behavior and a potential obstacle to reunification. For example, in November 2022, shelter workers reported concerns that the children had been exposed to drugs after observing them to be lethargic and with their "eyes rolled back" in their heads. S.A. later shared that Mother gave them pills to put them to sleep and, on a different

occasion, stated that she saw Mother with a small bag of white powder, which she believed to be drugs. Additionally, as alleged in a prior referral, S.A. reported seeing Father "poke [Mother] with needles."

Moreover, these reports and statements about Mother's suspected substance abuse did not exist in a vacuum. Mother was arrested in 2007 for using and/or being under the influence of illegal substances. And both maternal great-grandmother and Father—who admitted to regularly using methamphetamine—reported that Mother had a history of substance abuse. Father stated that he and Mother used drugs together years ago, and maternal great-grandmother reported that Mother began abusing drugs as a teenager. Further, although Mother contends she is not a "drug addict," she failed to submit to a single drug test during the dependency proceedings.

Mother, however, views the record differently. She emphasizes that maternal great-grandmother reported being unaware of Mother using drugs as an adult. She further tries to undermine S.A.'s March 2022 report about Father "pok[ing] [Mother] with needles" by highlighting that this referral was closed as inconclusive.[6] As to the children's reports about Mother giving them pills to sleep, Mother contends the pills could have been melatonin or another legal substance. And she claims that the small white bag of powder S.A. reported seeing, which S.A. believed to be drugs, could instead have been Alka Seltzer or baking soda.

But Mother's alternative interpretations of the evidence do not warrant a different conclusion. In lodging these challenges, she overlooks the governing standard of review, which requires that we " 'consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts,

---

[6] As the Agency responds, however, this report was closed as inconclusive because Mother "refused to cooperate" with the Agency's investigation.

in a light most favorable *to the trial court's ruling.'* " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067, italics added.)  Doing so here, the juvenile court could have reasonably inferred that maternal great-grandmother lacked current information about Mother's substance abuse when considering Mother and maternal great-grandmother's poor relationship and sporadic contact.  Similarly, the juvenile court could have reasonably found that S.A.'s statements at least suggested that Mother has a substance abuse problem.

Mother's reliance on two cases in which the appellate court reversed a case plan's drug testing requirement also does not compel a different conclusion.  In contrast to the record before us, the cases cited by Mother involved virtually no evidence suggesting a substance abuse problem.  (See *In re Sergio C.* (1999) 70 Cal.App.4th 957, 960 [reversing drug testing requirement imposed based "solely on the unsworn and uncorroborated allegation of an admitted drug addict" and where the parent "flatly denied all involvement with drugs and has otherwise cooperated fully with all of the court's orders"]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172–173, superseded by statute on another point, as noted in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239–1242 [reversing drug testing requirement imposed only on social worker's observation about mother's behavior being "somewhat out of the usual," including Mother being "obsessed with discussing a fortune-making invention" for which Mother made an offer of proof that the invention could potentially make money].)

Accordingly, considering the entirety of the evidence, we are unable to say the juvenile court exceeded the bounds of reason by ordering Mother as part of her reunification plan to submit to random drug testing—a requirement that is far less onerous than, for example, a treatment program for substance abuse.  On this record, it was not unreasonable for the juvenile

10

court to seek to rule out Mother's suspected substance abuse as a factor contributing to her erratic behavior and neglect of the children. (See *Christopher H.*, *supra*, 50 Cal.App.4th at p. 1008 ["court would have been remiss if it failed to address appellant's substance abuse *even though that problem had not yet affected his ability to care for Christopher*"] [italics added]; *Briana V.*, *supra*, 236 Cal.App.4th at p. 307 [where father was a registered sex offender, affirming juvenile court's order that father participate in sexual abuse counseling despite acknowledging the lack of evidence that the minors were at risk of sexual abuse by father].) We conclude there was no abuse of discretion.

DISPOSITION

The order is affirmed.

KELETY, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.

11